E-FILED
Tuesday, 31 March, 2020  02:25:17 PM
Clerk, U.S. District Court, ILCD

**IN THE**
**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**PEORIA DIVISION**

DAVID F.,
        Plaintiff,

v.                                                    Case No. 1:19-cv-01043-JES-JEH

COMMISSIONER OF SOCIAL
SECURITY,
        Defendant.

**Report and Recommendation**

Now before the Court is the Plaintiff's Motion for Summary Judgment (Doc. 14) and the Defendant's Motion for Summary Affirmance (Doc. 18).  This matter has been referred for a report and recommendation. The Motions are fully briefed, and for the reasons stated herein, the Court recommends the Plaintiff's Motion for Summary Judgment be denied and the Defendant's Motion for Summary Affirmance be granted.[1]

**I**

David F. filed an application for disability insurance benefits (DIB) on July 2, 2014, alleging disability beginning on April 1, 2011.  His claim was denied initially on June 12, 2015 and upon reconsideration on December 1, 2015.  David filed a request for hearing concerning his DIB application which was held before the Honorable Susan F. Zapf (ALJ) on September 18, 2017.  At that hearing, David was represented by an attorney, and David and a vocational expert (VE) testified.

---

[1] References to the pages within the Administrative Record will be identified by AR [page number].  The Administrative Record appears at (Doc. 7, 8) on the docket.

Following the hearing, David's claim was denied on February 13, 2018. His request for review by the Appeals Council was denied on December 11, 2018, making the ALJ's Decision the final decision of the Commissioner. David filed the instant civil action seeking review of the ALJ's Decision on February 13, 2019.

## II

At the hearing, David was 46 years old and lived with his wife and two minor grandchildren in Normal, Illinois. His then-current source of income was "100 percent disabled veterans [sic] income from Veterans Administration." AR 109. He served in the military for eight years including a tour in the Gulf War, and he was honorably discharged. Plaintiff's MSJ (Doc. 15 at pg. 3). David claimed the following conditions limited his ability to work: major depressive disorder; chronic fatigue syndrome; fibromyalgia; functional gastrointestinal disorders; fatigue; signs or symptoms involving the skin; neuropsychological symptoms; respiratory system problems; sleep disturbances; cardiovascular symptoms; weight loss; vitiligo; post-traumatic stress disorder (PTSD); and limitation on motion, ring, or little finger. AR 430. He previously worked in air conditioning and heating maintenance and as a security guard.

David testified that he quit working because of anxiety, panic attacks, and PTSD. He said he could not focus and concentrate and could not remember what to do at those jobs and did not want to put other people in danger, so he quit. He testified he was exposed to "some kind of Gulf War syndrome chemicals" while he was over there which caused vitiligo all over his body, including his genitals. He explained the vitiligo was one reason he was depressed and could not do anything. He said the vitiligo caused loss of pigment in his skin and it cracked, itched, and burned for which he took medication. He said he had to put hydrophilic cream all over his body five times per day. He said it was very

2

embarrassing; he could not be at work rubbing his genitals due to the itching and burning.

David received disability from the Veterans Administration (VA) because of the vitiligo and PTSD. He saw a psychologist, Stephanie L. Holt, Ph.D., once a month and a psychiatrist, William M. Kenny, M.D., as needed, and he took 80 milligrams of fluoxetine for his anxiety and trazodone for nightmares. He said he sat in a room all day and had anxiety and panic attacks, and half the time he did not know where he was. David explained that he was told he needed to be on his medications because when he went out in public, he was screaming and yelling at people asking why they were staring at him. He also took hydrocodone for his skin. He had never been hospitalized due to PTSD or anxiety. He had never gone to the emergency room for a panic attack. He said the fluoxetine "help[ed] a little bit." AR 120.

David further testified that he had a home care worker come to his house to cook, clean, wash, take him to the VA, and help him apply his cream. He said the vitiligo became worse over the years and he had a cane and wheelchair because of the pain it caused. He said he could not get the Gulf War or dead bodies out of his head. He said sitting and waiting to completely turn color was "devastating." AR 126. He also said that he did not want to be bothered with people and so he just stayed in his room depressed. He did nothing but sit in his room.

Upon questioning by his attorney, David testified that thinking about his vitiligo triggered his PTSD. The cream he applied gave him relief "for a little bit, but not a lot" and provided relief for "[p]robably five minutes." AR 135. He said sunlight burned his skin and the cold made it worse.

The VE was asked to consider a hypothetical individual with the same age, education, and past work as David who was limited to a range of light work with occasional climbing ramps and stairs, no ladders, ropes or scaffolds; occasional

3

stooping, crouching, crawling; limited to simple, routine, repetitive tasks of unskilled work; only occasional interaction with co-workers and supervisors of a brief and superficial nature; no interaction with the public; no more than occasional changes in work processes and procedures; and no concentrated exposure to temperature extremes or sunlight.  He testified the individual could not perform David's past work but there were other jobs that fit the hypothetical. One of the identified jobs would still be feasible even if the individual was restricted to no contact with the public at all, and there were other jobs available with that restriction.  The threshold for off-task behavior for the identified jobs was 90%, thus, if the individual was not going to be 90% effective, the person was not doing the job in terms of productivity.  The VE also testified that it would be at the edge of tolerable for the individual to take two unscheduled 10-minute breaks in addition to two normally scheduled 15-minute breaks during the workday.

### III

In her Decision, the ALJ determined David had the following severe impairments:  affective disorder; PTSD; anxiety disorder; vitiligo; subcutaneous nodules; lumbar degenerative disc disease; and obesity.  AR 46.  The ALJ made the following residual functional capacity finding:

> [T]hrough the date last insured, the claimant had the [RFC] to perform light work as defined in 20 § CFR 404.1567(b) except no more than occasional climbing of ramps and stairs, stooping, crouching, and crawling; no climbing of ladders, ropes or scaffolds; simple, routine, repetitive tasks of unskilled work; occasional interaction with coworkers and supervisors of a brief and superficial nature; no interaction with the public; no more than occasional changes in work processes and procedures; and no concentrated exposure to temperature extremes or sunlight.

AR 50.

4

The ALJ detailed David's consistent reports between June 2011 and March 2017 that his vitiligo, which caused white patches to appear on skin, caused him to be depressed, stay at home, fear that he would get skin cancer, cry all the time, fear other people because of their reactions to his appearance, burning and pain, avoid family, and small children to be scared of him. The ALJ included David's reports that he suffered from PTSD, was depressed and could not do anything, could not stay focused, had nightmares as a result of his time in the service, had no hobbies/interests, had problems getting along with others, seldom went outside, and could not pay attention. The ALJ detailed David's wife's reports of David's functioning which were similar to his own reports.

The ALJ also discussed the fact of David's service in the Navy, the notes from several compensation and pension examinations completed by the VA, and the fact that David had 70% service-connected disability for major depressions and 10% service-connected disability for vitiligo. At those compensation and pension examinations, David reiterated how his vitiligo caused him anxiety and pain, and he could not concentrate. At those examinations, PTSD was considered, anxiety, PTSD, and major depressive disorder was assessed, and his impaired concentration was noted. The ALJ explained that while a VA registered nurse stated "from a medical standpoint, this veteran certainly qualifies for unemployability," the VA and Social Security Administration (SSA) utilized different standards for disability and, as a result, the opinions of the Department of Veterans Affairs were not binding on the SSA.

The ALJ cited examination results which provided that David did not display any evidence of physical distress, his behavior and dress were appropriate, his behavior was dysphoric with a congruent affect, he had fair insight and judgment, he denied thoughts of suicide and suicide attempts, he had normal thought processes and thought content, was able to relate during

5

examination, was polite, pleasant, and cooperative, was alert and oriented in all spheres, not in any acute distress, and his memory was intact. The ALJ cited the instances David denied he was depressed, denied medication side effects, requested his medications be renewed, indicated his hydrophilic cream provided good relief, presented in good spirits, indicated hydrocodone really helped, and stated his medication seemed to sometimes help.

The ALJ also detailed Alvin E. House, Ph.D.'s August 2011, November 2012, and May 2015 consultative psychological evaluations, which resulted in Dr. House diagnosing David with major depressive disorder and anxiety disorder, chronic PTSD and major depressive disorder, and PTSD and major depressive disorder, respectively, at the three evaluations. Specifically, the ALJ detailed that at the August 2011 evaluation, David was minimally cooperative and responded "can't remember" to many basic questions including his age, birth date, and level of education. AR 64 (citing AR 525). At that time his thinking was unremarkable, ruminative, and fixated, his affect constricted, his mood anxious, he took "anxiety and depression pills" and he did not know and could not tell Dr. House whether his medication helped. AR 64 (AR 526). At the November 2012 evaluation, David was cooperative and compliant and unable to continue a simple, logical sequence, stating he did not know the answer. At the May 2015 evaluation, David was again cooperative and compliant, became increasingly tense over the brief evaluation, was alert and oriented, was adequately groomed, and his thinking appeared dominated by his anxiety.

The ALJ discussed evidence of a crisis assessment David underwent in April 2015 after going to the police station and accusing the police of using undercover officers to follow him and watch his office. The ALJ commented that it was unclear what prompted that paranoia "as the medical records from earlier in 2015 do not reflect this type of paranoia/delusion." AR 90. At the assessment, David

6

displayed a worried mood but was oriented in all spheres, his speech was spontaneous and coherent, he displayed focused concentration, and his memory was intact. He was sent to the ER where he was assessed with hypertension and anxiety and told to follow up with the VA.

## IV

David argues: 1) the ALJ's credibility assessment is patently wrong; 2) the ALJ erred by failing to address off-task time and absences in light of the narrative requirements of RFC 96-8p and the credibility requirements of 16-3p; 3) the ALJ erred by playing doctor in assessing the mental health evidence; 4) the ALJ failed to adequately take into consideration David's temperamental deficiencies and moderate limitations in concentration, persistence, or pace in the RFC and hypothetical question to the VE; and 5) the ALJ failed to adequately question the VE regarding David's need to apply cream in the workplace to his feet and genitals.

The Court's function on review is not to try the case de novo or to supplant the ALJ's findings with the Court's own assessment of the evidence. *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Pugh v. Bowen*, 870 F.2d 1271 (7th Cir. 1989). Indeed, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Although great deference is afforded to the determination made by the ALJ, the Court does not "merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). The Court's function is to determine whether the ALJ's findings were supported by substantial evidence and whether the proper legal standards were applied. *Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). Substantial evidence is defined as such relevant evidence as a reasonable mind might accept as adequate to support the decision. *Richardson v. Perales*, 402 U.S. 389, 390 (1971), *Henderson v. Apfel*, 179 F.3d 507, 512 (7th Cir. 1999).

In order to qualify for disability insurance benefits, an individual must show that his inability to work is medical in nature and that he is totally disabled. Economic conditions, personal factors, financial considerations, and attitudes of the employer are irrelevant in determining whether a plaintiff is eligible for disability. *See* 20 C.F.R. § 404.1566. The establishment of disability under the Act is a two-step process.

First, the plaintiff must be suffering from a medically determinable physical or mental impairment, or combination of impairments, which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, there must be a factual determination that the impairment renders the plaintiff unable to engage in any substantial gainful employment. *McNeil v. Califano*, 614 F.2d 142, 143 (7th Cir. 1980). The factual determination is made by using a five-step test. *See* 20 C.F.R. § 404.1520. In the following order, the ALJ must evaluate whether the claimant:

1) currently performs or, during the relevant time period, did perform any substantial gainful activity;

2) suffers from an impairment that is severe or whether a combination of her impairments is severe;

3) suffers from an impairment which meets or equals any impairment listed in the appendix and which meets the duration requirement;

4) is unable to perform her past relevant work which includes an assessment of the claimant's residual functional capacity; and

5) is unable to perform any other work existing in significant numbers in the national economy.

8

*Id.* An affirmative answer at any step leads either to the next step of the test, or at steps 3 and 5, to a finding that the plaintiff is disabled. A negative answer at any point, other than at step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. *Garfield v. Schweiker*, 732 F.2d 605 (7th Cir. 1984).

The plaintiff has the burdens of production and persuasion on steps 1 through 4. However, once the plaintiff shows an inability to perform past work, the burden shifts to the Commissioner to show ability to engage in some other type of substantial gainful employment. *Tom v. Heckler*, 779 F.2d 1250 (7th Cir. 1985); *Halvorsen v. Heckler*, 743 F.2d 1221 (7th Cir. 1984).

In the instant case, David claims error on the ALJ's part at Step Four.

## A

A claimant's RFC "is the most he can still do despite his limitations." 20 C.F.R. § 416.945(a)(1). An RFC assessment "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g. laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p; *see also Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001) ("In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record"). Part and parcel of an ALJ's RFC assessment is an ALJ's evaluation of a claimant's subjective symptoms. SSR 16-3p directs the ALJ to focus on the "intensity and persistence of the applicant's symptoms." *Cole v. Colvin*, 831 F.3d 411, 412 (7th Cir. 2016). SSR 16-3p provides that all the evidence, including objective medical evidence, is to be considered in evaluating the intensity, persistence, and limiting effects of an individual's symptoms and also the factors set forth in 20 C.F.R. § 404.1529(c)(3) are to be considered including: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; medications and their side effects; non-medication treatments; any other

9

measures used to relieve pain or other symptoms; and any other factors concerning the claimant's functional limitations and restrictions due to pain and other symptoms.  SSR 16-3p, at *7-8.

### 1

David argues that the ALJ's narrative discussion in support of her RFC finding and application of SSR 16-3p fall short because the ALJ:  a) failed to specifically address his off-task time due to his application of prescription cream to his hands, feet, genitals, and other affected parts of his body five times a day; and b) failed to specifically address his statements regarding secluding himself in his home as his vitiligo was a reason he was so depressed and suffered from panic attacks.[2]  He also argues, as the Commissioner puts it, in "a generic, conclusory section of his brief" that the ALJ's credibility assessment was patently wrong.  Dft's MSA (Doc. 18-1 at pg. 14).   The Commissioner argues that beyond his own testimony, David does not identify any support in the record for his claim that he had to apply lotion five times a day or, by extension of that testimony, that he would be off-task more than 10 percent of the workday. Similarly, the Commissioner argues that David has not demonstrated any error in the ALJ's reasoning in discounting the extreme reports of secluding himself as inconsistent with the record as a whole.

The Court follows David's lead and limits its review of the ALJ's RFC assessment and application of SSR 16-3p to the two discrete categories of evidence David identifies in his brief.  The ALJ discussed David's consistent complaints about his vitiligo, both that it was physically painful and had an effect on his mental health, throughout the Decision.  For instance, the ALJ included David's

---

[2] As the Commissioner points out, David does not challenge any of the physical restrictions in the RFC or the ALJ's analysis of his physical symptoms, and thus the Court limits its consideration of the ALJ's Decision to those parts addressing David's mental impairments and symptoms.

reports that he was afraid of people and what they might do and say to him about his skin changing colors, that he left the military due to vitiligo, and that he tried to explain his condition to people when they stared though he was tired of doing so. The ALJ also included David's reports that his body ached and burned all the time due to loss of skin pigment, and that his vitiligo became worse each year and he found it extremely embarrassing and upsetting. The ALJ repeated David's and his wife's reports that he had to put cream all over his body, David's reports that his wife helped him put the cream on his private parts, and David's report that a homecare worker helped him put the cream on his feet and hands. The ALJ also detailed the medical records which touched upon David's vitiligo and the instances medical providers noted David's visible vitiligo.

The fact that David's vitiligo affected his mood generally was also something the ALJ discussed in her Decision. She included his reports that his vitiligo led to David to stay to himself and cry, stay in bed with the covers over his head, and seldom go outside. The ALJ similarly detailed David's reports of PTSD and the depression and panic attacks he experienced. The ALJ included his reports of salvaging dead bodies following an airplane crash as part of his Navy service, which affected him such that he "put that in the back of [his] mind but it [didn't] work" and he instead kept it all inside. AR 59 (citing AR 635). The ALJ repeated David's report that he felt like he was passing out sometimes. He said his fears of worrying about what others would ask him about his skin or what they would think drove his feelings of panic and made him feel like fleeing.

As for medical providers' comments, the ALJ detailed that one doctor stated David was highly focused on his skin condition which interfered with family functioning, and he was not working because of his anxiety about his vitiligo and how others viewed him. A registered nurse who conducted a VA compensation and pension examination in March 2011 stated "in regard to the general medical

examination, this veteran has significant skin condition which has resulted in complete interpersonal complications such as low self esteem and insecurity as well as physical complications to include heat sensitivity and sun exposure risk." AR 62 (citing AR 632). Treating Dr. Kenny assessed major depressive disorder. Treating psychologist Dr. Holt stated that David had limited coping resources for dealing with the stress related to his skin condition and was rather stuck with his thinking. A nurse practitioner stated, "[David] has vitiligo and he says everywhere the skin is lightening, is where he has more pain, which is not obviously related to the vitiligo, but he says just everything is sore and aches." AR 71-72. Yet another doctor noted in his records upon seeing David that vitiligo lesions were usually asymptomatic and therefore the doctor was unsure about David's report that his vitiligo hurt.

Indeed, over the span of her 51-page Decision, the ALJ provided an extensive discussion of David's subjective reports as well as the medical providers' statements and observations. It is obvious the ALJ considered both the medical and non-medical evidence of record. The above reveals the ALJ considered the duration, frequency, and intensity of David's mental health symptoms (his recurring reports about how his vitiligo affected his thinking); precipitating and aggravating factors (going out in public); medication (the application of prescription cream); and any other measures he used relieve his mental health symptoms (staying inside, avoiding people). In other words, the ALJ complied with SSR 16-3p. The ALJ also built a logical bridge between the evidence and her RFC finding which *omitted* the limitations which David argues were warranted by the evidence. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010) ("an ALJ need not mention every piece of evidence, so long he builds a logical bridge from the evidence to his conclusion").

12

To support her observation that David had a habit of greatly exaggerating his pain, the ALJ noted that in December 2012, David did not display any musculoskeletal or neurological deficits and there was no evidence that the extensive patches of vitiligo affected his physical functioning. The ALJ also noted not just one provider questioned David's allegations of severe pain from vitiligo. The ALJ highlighted that David had been on the same medication – fluoxetine – for over six-and-a-half- years as of the hearing, that mental health records from 2012 to the present did not document complaints of side effects from that medication, and instead, David routinely reported that the medication was beneficial and he wanted to keep taking it. The ALJ confronted David's hearing testimony that he quit doing HVAC work because he could not remember how to perform the tasks properly, could not remember which house he needed to go to for installation, and was making mistakes with installation with evidence of record that he reported he lost jobs or not been given them due to vitiligo, that he stated he switched to self-employment because he could not handle the stress and anxiety of socializing and interacting with others on a daily basis, and he reported he was unemployed because he could not find work compatible with his health conditions. The ALJ concluded, "The contemporaneous evidence suggests the claimant quit working due to his anxiety and embarrassment over his skin condition, not because of physical or mental inability to actually install or repair HVAC systems." AR 88.

The ALJ also explained:

The undersigned does not doubt that the claimant experiences PTSD from some of the trauma he experienced in the military. The mental health records also indicate that the claimant struggles to cope emotionally with the skin disfiguration cause by vitiligo. However, the mental health records do not substantiate the degree of mental impairment alleged by the claimant. The undersigned notes that the claimant successfully worked for years despite PTSD and vitiligo.

13

> The records from 2011 do not appear to document any event or occurrence that would have caused any appreciable worsening of PTSD generally. The claimant's vitiligo has apparently worsened over the years, which could increase the resulting anxiety and decreased self-esteem.

AR 89 (emphasis in original). The ALJ then cited to record evidence (mental health treatment records) in support of her determination that David exaggerated his mental impairments. She acknowledged many of David's symptoms and limitations he reported were "plausible/reasonable," but not at the degree of severity he alleged. AR 90. The ALJ elaborated that if David was truly experiencing the extreme severity of symptoms he alleged at times, "one would expect that his mental health providers would routinely be adjusting and changing medications and one would expect that there would at least be discussion of possible psychiatric hospitalization." *Id*. She emphasized there was just one time there was "even a possibility of hospitalization" at which time, during a crises assessment, David was considered to have impaired judgment and limited insight due to delusions but was oriented in all spheres, he displayed focused concentration, and his memory was intact. *Id*. The ALJ again noted David had been on the same dose of fluoxetine since December 2011. He went from July 2012 to June 30, 2014 before he returned to his treating psychiatrist Dr. Kenny, at which time David said "things are looking up" and Dr. Kenny kept the medication regimen unchanged and told David to return in a year. The ALJ stated, "These are not the statements of an individual whose PTSD, depression, and anxiety are functionally debilitating[.]" *Id*.

The ALJ next acknowledged that David's August 2014 psychiatric evaluation results suggested some possible work-related difficulties, particularly with regard to interacting with others, but did not indicate a person with disabling mental impairments. In September 2015, David told Dr. Kenny things were going

14

well though neither he nor his wife was working.  In December 2016, David stated he was pleased with his fluoxetine.  The ALJ concluded such statements to treating psychiatrist Dr. Kenny were not indicative of the degree of functional impairment David alleged.  The ALJ explained the VA mental health records from 2011 to the present did not appear to document complaints of anxiety and panic attacks with any regularity or David's complaints that he did not know where he was, and those same mental health records did not appear to ever document David's reports of episodes screaming at people in public.  At times, David denied any current depressive symptoms.  The ALJ cited the following from the record as well:  there was a five month period during which David was off his psychotropic medication unknowingly; during that time period there were no records of any significant exacerbations of mental illness symptoms – there were no ER visits and no requests to see the VA mental health providers early; at the end of that time period, after months of being off his psychotropic medication, David's mental status examination revealed some anxiety but was otherwise normal.  The ALJ reasoned, "It is unrealistic for the claimant to have gone this long without psychotropic medication and not have experienced significant worsening of mental illness symptoms if his conditions were truly as debilitating as alleged."  AR 92.

That the ALJ included a narrative discussion describing how the evidence supported her conclusions as to the limitations caused by David's mental health impairments cannot seriously be disputed.  Moreover, the ALJ's narrative discussion of the record evidence makes obvious why she did not further consider or specifically address David's application of cream five times a day beyond discussing his testimony to that effect:  there was evidence he exaggerated his pain and medical providers noted vitiligo was typically asymptomatic.

The ALJ's ample discussion of David's mental health records and the inconsistencies between his own reports and those records does away with his

argument that the ALJ failed to specifically address his statements regarding secluding himself in his home.  Contrary to David's assertion that the ALJ played doctor where she failed to comprehend the waxing and waning of David's psychological symptoms, the ALJ dedicated several pages of the Decision to David's reports of waxing psychological symptoms.  But the ALJ explained the intensity of those symptoms was inconsistent with other record evidence (see above), including the instance when he reported "things are looking up," and when he reported neither he nor his wife were working upon their return move to Bloomington, Illinois but he stated "things are going well."  AR 90 (citing AR 1026); AR 91 (citing AR 1224).  Rather than play doctor, the ALJ did as she was required to do; she confronted both the evidence that supported her RFC assessment and the evidence contrary to that assessment, and she explained why she rejected the contrary evidence.  *See Indoranto v. Barnhart*, 374 F.3d 470, 474 (7th Cir. 2004) ("Although the ALJ need not discuss every piece of evidence in the record, he must confront the evidence that does not support his conclusion and explain why it was rejected").

## 2

David argues the ALJ did not provide the requisite "good explanation" for dismissing consultative psychological examiner Dr. House's three assessments and instead supplanted the doctor's opinions with her own.  The Commissioner argues David ignores the ALJ's detailed discussion and logical reasoning in determining Dr. House's findings were not reasonable indications of David's functioning.

After thoroughly setting forth the details of Dr. House's first consultative psychological evaluation of David on August 30, 2011 which included an assigned GAF score of 35, the ALJ acknowledged such a score reflected some impairment in reality testing or communication or major impairment in several areas.  The ALJ

16

explained it was understandable why Dr. House set forth that GAF score, but noted "that the claimant's behavior during the examination is inconsistent with contemporaneous records, suggesting a lack of effort and symptom magnification."  AR 66.  For example, David represented he did not know a variety of information including his birth date, age, education level, the date, the month, or the year, but he was able to provide such information to the VA at examinations at different times and was able to provide his educational and work history.  The ALJ also explained that the very next day following Dr. House's August 2011 evaluation, David did not display such a considerable level of confusion or lack of basic knowledge at his VA mental health visit with his treating psychologist. Indeed, at therapy on August 31, 2011, David was alert, oriented, and cooperative, his speech was normal, his mood was dysphoric and affect was appropriate to mood, his thought processes appeared logical and sequential, there was no evidence of hallucinations and no delusional belief, and his insight and judgment appeared to be fair.  The ALJ concluded, "Based on the available evidence, a GAF score of 35 is not a credible reflection of the claimant's general level of functioning."  AR 66.

After thoroughly setting forth the details of Dr. House's second consultative psychological evaluation of David on November 27, 2012 which again included an assigned GAF score of 35, the ALJ determined that score was:

> even less reliable, considering the claimant's performance during the examination was considerably better than a year earlier.  Moreover, the degree of impairment and extent of symptoms alleged by the claimant' during this evaluation is inconsistent with the mental treatment records from the VA.

AR 70. At that November 2012 evaluation, David correctly identified the date, month, year, his birth date, his age, the current president, and he was cooperative and compliant during the evaluation.  He was unable to write a very simple

17

declarative sentence, he endorsed high scores on sadness, hopelessness, and self-blame, among other things, he said he had trouble eating as he became sick when he ate, and he said he was unable to relax even at home. The ALJ once again thoroughly set forth the details of Dr. House's third consultative psychological evaluation of David on May 6, 2015 including David's report of severe symptoms of anxiety and depression such that Dr. House stated, "His thinking and judgment appear compromised by his extreme distress." AR 46 (citing AR 1120).

As for David's VA mental treatment records, in January 2012, David was alert, oriented, and cooperative, his speech was normal, his thought processes appeared logical and sequential, and his insight and judgment appeared fair. He had similar mental status and objective findings in September 2012. In June 2014, David reported "things are looking up," he reported a therapeutic response to his psychotropic medication regimen in terms of mood and sleep, he denied feeling depressed, and he presented in a friendly, polite manner. In August 2016, David was cooperative with slightly increased psychomotor activity due to rapid speech which cleared and returned to normal once he calmed down, he was patient but somewhat anxious, he was alert, his thought process was coherent and goal directed, he had some insight into his problems, and he had fair to marginal judgment.

Far from playing doctor in her consideration of Dr. House's evaluations, the ALJ did as she was required – she considered the bulk of David's mental health records and how they compared and contrasted with other evidence of record (including Dr. House's impressions as well as David's own statements). As illustrated above, the ALJ's expressed reason for rejecting the GAF score of 35 – his general level of functioning – is supported by his performance in 2011 versus his performance in 2012 before Dr. House, as well as his mental status and objective examination findings at VA mental health visits. Furthermore, as the

Commissioner points out, the State Agency psychological reviewers' opinions support the ALJ's separate consideration of the record evidence.

The ALJ discussed that a State Agency psychological consultant opined in connection with David's prior application in March 2012 that David "clearly dramatizes his symptoms in the context of seeking compensation/disability," and the consultant further opined that David's impairments could reasonably be expected to be due to the diagnosed disorder of major depressive disorder and mild PTSD "but the described severity of functional impairment appears to be beyond what would be expected given the severity of the symptoms described in the medical evidence." AR 81. The ALJ also detailed another State Agency psychological consultant's December 2012 opinion that David's GAF score of 35 "was not commiserate with other data in file. During the telephone interview, no abnormalities were detected." AR 82. In May 2015, another State Agency psychological consultant opined David had, among other things, the cognitive ability to remember general work procedures, retained the capacity to understand and remember moderately complex instructions, had the attention and concentration necessary to persevere at and complete operations for time periods usually expected in the work force, retained the capacity to maintain a schedule and be on time, retained the capacity to adapt to simple changes in daily routines, and retained the capacity to be self-aware. The evidence of record provides substantial support for the ALJ's consideration of Dr. House's evaluations.

**B**

David next argues that the ALJ erred because she failed to adequately take into consideration his moderate limitations in concentration, persistence, or pace in the RFC finding and hypothetical question to the VE. He also argues with regard to the hypothetical questions posed to the VE that the ALJ failed to adequately question the VE regarding David's need to apply cream in the

workplace to his feet and genitals.  The Commissioner argues that because the ALJ did not find David had any off-task limitations related to his application of cream, the ALJ had no obligation to ask the VE about such limitations.  As for David's moderate limitations in concentration, persistence, or pace, the Commissioner argues David's argument in that regard should fail because David ignores the additional restrictions the ALJ included in the RFC to account for those limitations, making his cited cases inapplicable.  The Commissioner additionally argues that the ALJ acknowledged David had some issues with concentration and provided corresponding restrictions in the RFC.

"As a general rule, both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the medical record."  *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014).  The hypothetical must therefore "explicitly account for" deficiencies in concentration, persistence, or pace.  *DeCamp v. Berryhill*, 916 F.3d 671, 675 (7th Cir. 2019).

Because the ALJ properly considered the medical evidence pertaining to David's vitiligo, as addressed above, David's argument that the ALJ failed to adequately question the VE regarding David's need to apply cream in the workplace to his feet and genitals fails.  The Court can trace the path of the ALJ's reasoning between medical evidence of David's vitiligo, specifically doctors' comments that vitiligo was typically asymptomatic, and the ALJ's omission of any indication to the VE that David needed to apply cream to his feet and genitals five times a day.  *See Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (stating that an ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning").  In any event, the Commissioner correctly points out that the ALJ specifically asked the VE about the potential for additional breaks and the

VE testified that two additional breaks of ten minutes or less in addition to the normal two 15-minute breaks would be at the edge of tolerable.

As for David's argument that the ALJ did not sufficiently account for David's moderate limitations in concentration, persistence, or pace, it is underdeveloped. David's argument is mostly comprised of Seventh Circuit case law setting forth the oft-repeated statement that an ALJ must account of for a claimant's moderate limitations in concentration, persistence, or pace and the oft-repeated statement that it is not necessary for an ALJ to use any particular terms so long as the RFC and hypothetical question to the VE sufficiently conveys a claimant has such limitations. What the extensive body of case law on this issue makes abundantly clear is that it requires a nuanced application of such boilerplate statements of the law to the particular facts of the case. Here, David merely cites four pages of the record and states, "David's concentration difficulty is well-documented in the record." Plf's MSJ (Doc. 15 at pg. 14). David has done nothing more than lodge his complaint that the ALJ erred in accounting for his moderate limitations in concentration, persistence, or pace and left it to the Court to draft an argument in support in order to determine whether David is correct.

Ultimately, the ALJ sufficiently accounted for David's moderate limitation in concentration, persistence, or pace. Throughout the Decision she documented the instances David reported issues with concentration and what he reported caused those issues. She pointed out that the mental health records indicated David struggled to cope emotionally with his vitiligo. She acknowledged that his vitiligo had apparently worsened over the years "which would increase the resulting anxiety and decreased self-esteem." AR 89. She detailed State Agency psychological reviewers' opinions which provided, among other things, David could remember locations or work-like procedures and could also understand and remember short simple instructions although he had difficulty remembering

21

detailed instructions, he was capable of performing simple tasks, he had difficulty interacting appropriately with the general public and tended to withdraw and self-isolate such that he was limited to work tasks that did not require interaction with the general public, he retained the capacity to understand and remember moderately complex instructions, he had the necessary attention and concentration to persevere ad and complete those moderately complex instructions for time periods usually expected in the work force, he had the pace and endurance necessary to fulfill a normal workday and week on a consistent pace, he would require only common numbers and lengths of rest breaks, and he could relate appropriately in socially demanding settings with low stress demands that required only brief superficial interactions and with reduced interpersonal contact away from the general public.

> The ALJ concluded:

> The evidence of record fails to substantiate the degree of impairment in memory, concentration, persistence, and motivation that the claimant alleges. Rather, at many mental health visits, the reported symptoms and observed symptoms and signs are relatively minimal, with some visits where the claimant expressly denies any significant symptoms . . . the evidence fails to establish that he experiences significant symptoms of depression, anxiety, and/or PTSD on a regular consistent basis that would make it difficult for him to have the necessary focus and motivation to be productive in less [sic] mentally demanding work setting.

AR 92. The ALJ explained that because David was "understandably" self-conscious about his skin appearance due to vitiligo and avoided being around others due to his perception that they were staring and laughing at him, David would do best in a work setting that did not require interaction with the public. Given evidence that David generally displayed appropriate social behavior at his medical visits over the year, there was not any compelling evidence he would be

22

unable to tolerate occasional interaction with coworkers and supervisors of a brief and superficial nature. Thus, it is clear the ALJ adequately took into consideration David's limitation in concentration, persistence, or pace where she accounted for his mental health symptoms by limiting him to a less mentally demanding work setting – simple, routine, repetitive tasks of unskilled work, no more than occasional changes in work process and procedures. As David so often reported his vitiligo caused concentration issues, the ALJ properly limited his interaction with others to account for those reports as well as his repeated reports that he chose not to go outside his home for fear of others' reactions. The ALJ committed no error. *See DeCamp*, 916 F.3d at 676 (stating that an ALJ need not use "specific terminology" in crafting the hypothetical question for the VE); *Paul v. Berryhill*, 760 F. App'x 460, 465 (7th Cir. 2019) (unpublished opinion) ("Though an RFC assessment need not recite the precise phrase 'concentration, persistence, or pace,' any alternative phrasing must clearly exclude those tasks that someone with the claimant's limitations could not perform").

## V

For the reasons set forth above, it is recommended that: 1) the Plaintiff's Motion for Summary Judgment (Doc. 14) be denied; 2) the Defendant's Motion for Summary Affirmance (Doc. 18) be granted; 3) The Clerk of Court be directed to enter judgment as follows: "IT IS ORDERED AND ADJUDGED that the decision of the Defendant, Andrew Saul, Commissioner of Social Security, denying benefits to the Plaintiff, David F., is AFFIRMED."; and 4) this matter be terminated.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) days after service of this Report and Recommendation. FED. R. CIV. P. 72(b)(2); 28 U.S.C. § 636(b)(1). Failure to object will constitute a waiver of objections on appeal.

*Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

*It is so recommended.*

Entered on March 31, 2020.

<u>s/Jonathan E. Hawley</u>
U.S. MAGISTRATE JUDGE